May I please have the floor, counsel? I'm Jennifer Camden on behalf of the people. This is a state appeal from an order that barred the state from viewing records that were submitted by hospital in response to the state's subpoena seeking results from any blood tests that originated from the defendant's treatment on the day of a motor vehicle crash that led to a DUI charge. The court also barred the state from introducing any blood test results at trial. Now I'll begin by emphasizing Ms. Camden, do you think the, sorry to interrupt so early, but do you think that the ruling about the introduction of the documents at trial was like putting the cart before the horse, premature? Your Honor, in my notes I have the phrase cart before the horse. Oh. Okay. Yes. Well, yes you do then. Yes I do. Okay. Yes. You are a very bright individual, obviously. Go ahead, I'm sorry. Meeting of the minds. Yes, the proceedings below were very circular and yes the cart was placed before the equine animal. The issue of the invincibility of these test results was resolved before the state was permitted to know whether test results even existed, let alone to see them and decide if they helped a DUI case, decide whether the state would want to introduce them. Apparently they were, there was a blood draw. I thought I saw it in the defendant's brief. He did say that, Your Honor, but I don't see where in the record that is established. He is asserting that a blood draw occurred, but at the hearing he testified, the defendant testified only that he did not consent to a blood draw. I guess it's kind of immaterial to your argument anyhow, isn't it? It's, in a sense, yes. Not in the sense that, it is relevant to the cart before the horse point in that I'm standing here arguing about something that may not exist. That may not exist. Yeah, so in that sense I do think that it is relevant. I also want to make sure the court knows at the outset that these documents remain in a sealed envelope in the circuit court, that they're not in the record on appeal. The envelope that, so the envelope that would contain any possible results indicating whether such a test occurred is sealed. The defendant never testified that his blood was tested. Officer Webb, the only other witness at this hearing, also never testified that he ordered a blood test or that he knew anything about the existence of a blood test being done. So is the blood test really relevant? I mean, whether or not a blood test was done, is that the issue or is this a Fourth Amendment issue of really whether you're entitled to the records at all? Whether this is a, you know, they went into the exigent circumstances and the arguments which seem to go to the blood draw. Right. But you're asking to just see all the medical records, right? No, Your Honor. No, Your Honor. Well, a couple points. Number one, there were two separate orders. One, barring the state from seeing subpoenaed records and the second, barring the state from the admissibility of those records. I'm talking about the subpoenaed records. Yeah. You don't know what they are. Right. Well, the state did enter as a proposed supplemental record and the court accepted as a proposed supplemental record the subpoenaed document, not the documents that were returned, but the request for records. And in that document, the state requested blood test results. So, Your Honor asked whether the state wants to see all of the defendant's medical records. That wasn't what the state requested. The state only requested... I don't have that. You made a request on the basis of assuming that there had been a draw. Well, the... So that really seemed to be the underlying operative basis of this entire argument and the briefs of counsel. Right. That there had been a draw and the results are in a sealed envelope, and this is what we're arguing about. Right. Well, what happened, Your Honor, was that the first thing that happened was that the defendant filed a motion to suppress blood test results from a blood test that he asserted had occurred. The second thing that happened was that the state issued the record subpoena not requesting any blood test results. So, I presume that that could be the basis of the state's assumption that such test occurred. Sure. So, there were errors below, including errors due to this circularity. The court found that the defendant was subject to this action under the Armour case, but there was no proof either that a blood test occurred or that it was ordered by the state. Again, Officer Webb... Well, let me expand the scope of that. The defendant's position, as I read it, within this context, is much broader. He did not want treatment. He said he didn't need treatment. He goes into... Basically, his position is he's forced to undergo treatment, and everyone seems to agree or assume that part of this treatment, contrary to his will, was some sort of draw of blood. And so, I would like you to consider your position in terms of the expanded scope of the factual cases, reflecting basically the argument of the defendant in this case. Right. Well, with respect to the defendant's argument that he did not consent to medical treatment, the response is that consent to medical treatment is not a prerequisite under the statute to the admissibility of blood test results, but you don't get there. Well, you don't get to there being a draw unless he is taken to the hospital, correct? Yes, but I don't... Well, he's saying that he didn't consent to going to the hospital. Exactly. Is that what in the transport of him to the hospital? Yes. Is that what you're... Yes, in order to get a draw, essentially. Well, even though they didn't participate in the draw. I'm not so sure. That's a question I have, is what was the purpose of the transfer? You have a guy who'd been in an accident. Did he appear to be... The officer says he appeared to have a broken foot, so was the purpose to get a draw or to get him treatment for the broken foot? Your Honor, there was no... The evidence that was submitted at the hearing was that the emergency medical technicians told Officer Webb that he needed to go to the hospital. There was no testimony that the EMTs told Webb that they wanted to draw his blood. Okay, but he tells the officer, I don't want to go to the hospital. He's not even in the same... He's in a different vehicle, and he's saying, I do not want to go to the hospital, and they physically remove him from the vehicle and put him in the ambulance, and then... And so, you wouldn't have the whole question of the draw if he were allowed to make the decision himself as to whether he was going to accept or refuse medical intervention. And so, don't you start with the question of whether or not there was an exigent circumstance which kind of overrode his will to making the decision, I don't want to go to the hospital? I mean, I have not been in any kind of major accident where somebody else has made that decision, but I've been in fender benders where officers have said, do you think you need medical assistance? And I've said no, and that's it. I've never encountered a situation where someone has said, no, I do not want to go to the hospital, and was forced to go. Now, I guess you could argue that he wasn't in his right mind, or he was so drunk, he didn't know whether or not he really needed treatment. But how do you get beyond that to begin with? Yeah, that his will was overridden. Right. A couple things. If the argument is that, but, wow. Go ahead and answer the question. Thank you. One part of the answer is that Your Honor mentioned exigent circumstances, which is an exception to the warrant requirement. So for those ideas to be in the mix, we have to first get to state action. And so how do you get to state action? The cases that the people cited in the briefs show that state action in this context refers to who ordered a blood test, and that was something that the defendant didn't show. Another point, Your Honor, is that here, there was probable cause to arrest this defendant. Okay. And, you know, the odor of alcohol. What was that? What was the probable cause? It said in the people's brief, Your Honor, that there was odor of alcohol, slurred speech, two witnesses told the officer that they had seen him driving. But he's not arrested until he's at the hospital, right? Right. So he's cuffed and forced into an ambulance and handcuffed, and not, I'm not sure how much later, but he's much, sometime later, is actually charged. Well, Your Honor, I'd ask the court to consider what the officer should have done in this situation. Well, one thing he could have done is, I guess, not either arrested him at the time and taken him into custody, or acquiesced to his statement that he did not want treatment. Right. Well, Your Honor, we were at the scene of, think back, we were at the scene of a vehicle crash. An ambulance team was on the scene saying that they wanted to take this defendant to the hospital. The officer saw that his foot was pointing the wrong way. And I'd be wary of inviting, of expanding the concept of what types of laws are going to govern the admissibility of blood alcohol test results, where the appellate court has said that only the Fourth Amendment constraints for the specific statute, which is 501.4, is going to govern, is going to govern that. Again, the statute doesn't say that hospital-initiated blood tests shall only be admissible in DUI cases if the defendant consented either to medical treatment in general or to a blood test in particular. The statute just mentioned so, whether it was routinely done by the hospital lab and ordered in the court to expand the body of law that courts look at in these circumstances to include concepts that are better suited to civil actions than criminal ones. The defendant isn't citing suppression cases here in his answer brief. He's citing civil cases for these concepts about consent. And again, I point the court to the Poncar case, which is discussed extensively in the People's Answer Briefs, or Opening Brief and Reply Brief. In that case, the defendant also did not, was injured at the police station, DUI defendant injured at the police station, and the officers in that case decided that the defendant needed medical treatment. Now here, that's one difference here. Here we have an EMT's informing web that they, in their medical training, want to take the defendant to the hospital. And the defendant in Poncar also specifically refused a nurse request for a blood draw, and yet the court ruled that the results of that test were admissible. And what was the basis for that ruling? That the, what was the basis for that ruling? I apologize. No, no. Because the appellate court in that case rejected the, what had happened in that case, again, Your Honor, was that the DUI defendant was injured while in police custody. He had been. But he was already under arrest. Yes. For DUI, right? Okay. Go ahead. I'm sorry. And he was combative at the police station, and he was injured by police. The defendant below ordered, or sorry, argued that there should be an exception to Section 501.4 if a suspect receives medical treatment after being injured in police custody. The appellate court rejected that idea and found that the test results were not admissible under the Fourth Amendment because there was no proof that this hospital-initiated blood test was the result of police subterfuge, which is the only exception to, under which the results of hospital-initiated blood tests could be barred under the Fourth Amendment. I think your time's up. Thank you. Thank you, Your Honor. May it please the Court, counsel, with the limited time, I'm just going to jump right into this. This is a Fourth Amendment issue here. This is an issue of state action. The issue of whether or not there was a blood test drawn, it's a red herring. The trial judge held up the envelope and said, I presume this was the blood test that was done on the day that everyone proceeded to hearing as if the blood test had been done. That issue is a non-starter here. It's not something I'm going to spend a ton of time on. But what I would like to do is jump to a question that Justice Case asked the State, and that is, what was the purpose of Michael Brooks going to the hospital? Was it to treat his foot or was it to draw his blood? And I think the trial judge answered that question, and he answered it very clearly. I'm not going to quote the whole thing, but he basically says it's strange credula to believe that this particular officer, his primary purpose is forcibly requiring the defendant to go to a hospital, A, not of his choosing, and B. And what does that mean? Does that mean he wanted to go to another hospital or that he just didn't want to go to the hospital? He just didn't want to go to the hospital. Okay. It wasn't like they said you're going here, not there. Okay. No. He said numerous times over and over again from his initial interaction with Officer Webb, I don't want to refuse medical treatment. And as this Court is very well aware, the Supreme Court in Cruzan and the Illinois Constitution has said you have a right to refuse medical treatment. And as Justice Chapman just pointed out, Michael Brooks was not charged with anything until he was at the hospital. He had the free right as a competent individual, and the State hasn't argued or proven that he was incompetent, to refuse any medical treatment here. This is a constitutional issue, and it's a Fourth Amendment issue, because as the trial judge correctly noted, Michael Brooks is not at a hospital to have his blood drawn without Officer Webb. So let me ask you just a hypothetical. If a gentleman is shot in a gang neighborhood, somebody is found lying on the street bleeding, an officer in good faith comes up and says you need to go to the hospital. And the ambulance arrives, and everybody's around spectating. Does the officer leave that person to die? He does not. Isn't there a good faith exception for the officer's perception? And I would say that there probably is, Your Honor, and I would say that we have to look at the injury, because that's one of the huge problems with the State's argument here. They don't draw a line. What's the line? A broken foot? A scraped knee that Officer Webb comes up and says, well, that looks pretty serious. Ship him off to the hospital. And that's why I asked, what was the purpose? Because it seems like we discussed good faith in terms of what officers do as far as other kinds of circumstances, arrests, searches, but it also seems that there should be some good faith argument in this case as to whether he was acting in good faith or maybe, as Justice Chapman indicated, maybe not such good faith. And I think that that was addressed by the trial judge. If I can finish that quote, the trial judge was saying the defendant was suspected of being involved in one vehicle accident, possibly involved in consumption of alcohol, and the defendant was pretty adamant and pretty defiantly saying to the officer, you can't get me for driving that vehicle. And the defendant has non-life-threatening injuries, and it's strange credula to think that the reason for the officer's actions was anything but to obtain evidence that could be used later in the prosecution for a DUI and something else, or something else. But then why not arrest him? If you really think he's got, if you really think you're going to charge him with DUI, why not put him under arrest? That didn't occur. And it eventually did, as Justice Chapman pointed out. He was eventually arrested once he got to the hospital. So at some point, he's going to arrest Michael Brooks. It's very clear that that was his intention. But doing it the way he did it here in the face of mere suspicion of driving under the influence of alcohol creates a serious problem where now we have police officers strolling up to the scene and overriding people who are not under their own rights to refuse medical treatment. And that's what the trial judge really had a problem with here. And it's a huge policy issue here. And the trial judge said this, if we're going to accept the state's position today in front of this court, any time the state did want a blood draw, they simply drag a person out of their vehicle against his will, they force him onto a gurney, they force him into an ambulance, handcuff him to the gurney that he didn't want, and then wash their hands of everything by saying, well, the officer left. I still think that falls short of the good faith exceptions. I don't think there's any discussion about the good faith of an officer. Well, Your Honor, I guess you could... Now, I agree with you that perhaps these circumstances are as put forth in that order or what you just read, but I still wonder about this good faith exception to the Fourth Amendment. Well, Your Honor, I guess speaking to that, I would go back to the hypothetical that you presented, where the officer comes upon someone who's shot, or I'll extend the hypothetical, someone who's unconscious or is gushing blood from his or her head. And now the officer looks and the officer says, this individual has life-threatening injuries. We need to this person could die in front of me. We need to get them to the hospital. And I also ask the Court to consider a hypothetical where we take Officer Webb out of this equation and we have three or two or however many paramedics coming up to a situation where Michael Brooks is sitting there with a broken foot and the paramedics come up and say, Mr. Brooks, you need to go to the hospital and we're going to force you. They can't do that. A physician can't treat against his will. Well, let me ask you, was there a driver in that car? There was. Okay. So he was sitting in the passenger seat. So presumably somebody that I guess we can presume wasn't drinking or wasn't at least with the defendant could have also taken him to the hospital if he chose to go. Very easily. And if that was really Officer Webb's intention, Officer Webb could have said, fine, I'll follow you to the hospital. I'll have your friend drive you to the hospital for this broken foot you have, not for your broken neck, not for your gunshot wound. Michael Brooks is sitting here. He's sitting in the car. And somehow he got in the car. He had got in from the car from the alleged site of the accident and he's speaking to Officer Brooks or Officer Webb and saying, I don't want to go. I don't want to go to the hospital. He's not slipping in and out of consciousness. He's simply got a broken bone in his foot. And the officer decided, you're going. And that's not okay. That is a violation of Michael's constitutional rights when there's other options here. There's other options except force, force, and more force. And that's what the officer did in this situation. Now, if he had chosen to arrest him at that point and said, I believe you're under the And I've thought about this question. And the State really didn't raise this in their brief. And I'm guessing that Your Honor's question is a concern about further on down the line Michael Brooks coming and saying, I was hurt and you didn't treat me, so now I'm going to hit you with a Section 1983 action or something like that. And I've thought about that. And really there's several options here. As the State's pointed out, there's EMTs on the scene. There's witnesses on the scene. There's a bunch of other people on the scene. And if for some reason something comes up down the line, they're all going to be available to say, that man refused medical treatment. They could certainly take him to jail or he could sign a waiver that says, I agree that I have rejected the medical treatment that this officer offered me before he ever brought me here. I'm not sure that's, was that your question? Well, kind of. I mean, can he force him to walk to the police car? Or does he have an obligation to get him medical treatment? I don't think he has an obligation to get him medical treatment once Michael Brooks has exercised his constitutional right to refuse it. There's no dispute in the record that there are other officers on the scene and there's a driver in the vehicle. If they could pull the police car right up next to the jeep and simply help Michael into the police car, if he needed that help. I mean, there's not even any indication in the record that he needed that help. So then they take him into custody and take him to jail. That's correct. If that's his desire. That's absolutely right. And as Your Honor pointed out, I mean, Michael was able to get into that jeep. He, the record's very clear that as the ambulance goes two blocks and pulls away, Michael gets out to the point that Webb has to force him back in there, put him on a cot and handcuff him inside. He's clearly not having too hard of a time walking around or moving. And so this argument that, you know, Officer Webb decided that Michael Brooks has constitutional rights, that argument just doesn't hold water here. There's so many other options that if the officer, as Justice Cates pointed out, was really in good faith concern for the health of Michael Brooks, there's a lot of other things he could have did instead of body slamming him three times all the way through these proceedings. But then are you making the jump that he went, he intentionally made him go to the hospital for the purpose of the blood draw? I see my time is up. Go ahead. Your Honor, I certainly think the jump could be made that Officer Webb knew that once Michael Brooks got to the hospital, that this statute existed and there was going to be a blood draw there. As the trial judge pointed out, we don't have to ignore the common sense aspect of this case. Well, he was there for, I thought I read 12 hours, so it's very unlikely they would not draw blood in his treatment because if he's given any anesthetic, they're going to need to know whether or not it's going to react or interact with. But then do we run into the, that's where we run into the issue of did he have time to get a warrant? If this was truly his intent, and he's there 12 hours, did he have the time to get a warrant? I mean, those are the issues that we then confront if we make the case. And I certainly would argue to this Court that if Michael Brooks is laying in the hospital for 12 hours, that Officer Webb has ample opportunity to get a warrant. They could have started the process right at the scene. And that brings us back to this Armour case that the State basically says doesn't apply here because the officer wasn't hovering over the defendant's arm saying put the needle in it. And that appears to be the State's argument that this is the only way State action can come about in a case like this, which that And so, you know, that brings us back to the facts of the Armour case. Like the judge found there's no exigent circumstances here. Go get a warrant. And the officer just kind of dropped him off there, and we don't have to ignore his knowledge of the statute, and walked away and said I'm going to wash my hands of all State action here. Forced him out of the Jeep, forced him on a gurney, handcuffed him to the ambulance, forced him into the hospital for medical treatment he refused numerous times, but I didn't do anything. I mean, that argument just simply strains common sense. And for those reasons, we believe that the trial judge was correct to not only suppress this evidence to say the State can admit it to trial, but I'll jump all the way back to the opening portion of the State's argument when we were talking about whether they can subpoena it or not. And, Your Honors, it's a simple fruit of the poisonous tree argument. If we have a Fourth Amendment violation from the outset, they shouldn't even be allowed to subpoena these documents, let alone introduce them to trial. If there's no other questions? I don't believe there are. Thank you. Thank you, Your Honors. Counsel? The access to these documents is not a fruit of the poisonous tree issue because admissibility of blood test results is not a prerequisite for disclosure. And I'd point the Court to the Kopeck case and the Norrin case, both of which cases involve disclosure issues in which the documents remained sealed and issues of admissibility were not addressed. With respect to the defendant's argument that the injury was not serious, this was a broken foot. The defendant in the Poncar case had a cut ear. His ear was cut and bleeding, and that's why he was taken to the hospital, and that was the premise upon which his blood was drawn, and that test was ruled admissible because there was no Fourth Amendment violation even though the defendant in that case was injured as a result of officers restraining him at the police station. Your Honor, Justice Chapman mentioned a warrant, the ability to get a warrant. Officer Webb was not at the hospital when the treatment occurred. The defendant is arguing that the officer needed a warrant not to get a blood draw because he wasn't there. The defendant is arguing that the officer needed a warrant for a blood The people in the reply brief in the last few pages talk about how problematic that concept is. Ms. Camden, I'm sorry, Justice, go ahead. No, go ahead, please. Go ahead. Your turn. The argument, as I understand it from the defendant, is that there were no external circumstances by which, which justified the officer putting him in a position of treatment in a hospital against his will. The expectation being that in the normal course of that treatment, if the hospital is not negligent, they're going to draw blood and understand what kind of patient they've got. And I think your characterization of the defendant's argument is much too narrow. Especially a patient that appears apparently to be intoxicated. Well, Your Honor, the exigent circumstances is an exception to the state action here. Now, and again, in this context of admissibility of blood alcohol test results, state action is who ordered the test. That's the difference between this case and the Armour case, which the defendant cited. I fear that the Court is being seduced by the but-for argument, that but-for the state's involvement in helping the EMTs at their request, mind, that these test results wouldn't have occurred. And again, I point the Court to the Poncar case, the Olson case, and the Coffin case, all of which involve circumstances where a but-for argument could be made. In fact, in the Poncar case, it's a lot easier to make. And yet, and yet those test results were admissible. I also want to point the Court to the Coffin case for another reason, because it provides a historical perspective on the elimination of the consent requirement in the DUI context. There's a strong legislative policy in favor of the admission of these blood alcohol test results, and that's why the General Assembly in 1982 eliminated the consent requirement here. And the defendant has not cited a single case where consent either to treatment itself has been ruled the basis for ruling tests inadmissible. That's Poncar and Coffin. But the defendant also hasn't cited any case in which lack of consent of a ride to the hospital has been used as a reason to render these test results inadmissible. Okay, wait, wait, wait. A ride to the hospital is not treatment, Your Honor. Okay, but you're talking about blood test results. We don't even know if blood test results exist. You're right. Okay? So we need to back this up. We need to talk about, really, to me the issue is can the state issue a subpoena for hospital records of an individual who was taken against his will to the hospital? Your Honor, it... We're just talking about medical records in general. You don't even know what's in It could be his blood results about his kidneys or they might have thought he had an abdominal injury or something. Who knows? But my point is can you use the subpoena power of the state to get the records, unknown records, in a situation where an officer has forced a person to go to the hospital against his will? That's really, I mean, we don't have any probable cause here to know that a blood draw was taken. We're just talking about hospital records. Right. So I don't know of an exception. I don't know if, I don't know why you have that right. I'm trying to find a basis for that. Can you help me? Yes, Your Honor. The, the... Go ahead. Thank you, Your Honor. This subpoena was not over-broad, was, it sought only the blood test results. In fact, the, the court in Copac, I believe, approved of records being turned over when it was all medical records of the defendant for that day. Here the state's request was much more narrow. It wasn't over-broad, it wasn't a fishing expedition. There was duly returned to the court in a sealed envelope. This process was proper. And that was Poncar. You're citing, you're citing the Poncar case for that proposition. The, the Copac case. Copac. Sorry, I said Poncar. All right. Yes. The, yes, it was the Copac case in which the state sought every bit of the defendant's medical record, and, and the court, and the court approved it. And in that case, the court did not ask whether it was admissible, which I, I think is what Your Honor's asking about, is what if these, what if these records aren't even admissible? No. I, I don't, I don't care about the admissibility. I only care about whether or not the subpoena power can be used. Yes. Okay. Absolutely, Your Honor. The Wilbur case, Norrin, Copac, I'd also point the court to the Illinois Rules of Evidence showing that privilege doesn't apply. Thank you very much. Thank you, counsel. We appreciate the briefs. All right. Thank you, counsel. Thank you.